Mr. Smith, you ready to proceed? Yes, Your Honor. Okay, you're reserving five minutes? Yes, Your Honor. Thank you very much. Okay, I'll try to let you know when you run up to it. Thank you, Judge Rollin. May it please the Court, I'm Matthew Smith for the appellant, Sony Corporation. We've got basically two issues, the two claim construction issues, and I'd like to start with the first one, which is the board's construction of the term. In the blue brief at 30, you fault the PTAB for relying on two obscure sentences in the background of the 596 patent. Why are those two sentences obscure? Why are they different than any other portion of the spec? Thank you, Your Honor. Obscure in this context refers to the clarity of that passage, which I think is a little bit lacking. I think it's just difficult to figure out exactly what that passage to mean. As demonstrated by the parties and the board's shifting, sort of parsing of that passage throughout the history of this case. More clear are the other passages in the specification, which I think pretty clearly dictate what the term read-only area in said memory, at least has to be, from the correct perspective. Okay, and speaking of that, in the gray brief at 15, you criticize the PTAB and Fujifilm for distinguishing between read-only memory and read-only area in said memory, calling it a dubious distinction. But the specification uses each of the terms, but doesn't ever appear to directly equate the two. Does the specification equate the two phrases? And if it intended for these two terms to mean the same thing, why didn't the specification use the same terminology consistently throughout? So, yes, Your Honor, I don't think the terms mean exactly the same thing. One is, first of all, clearly referring to an area in a memory. Then it's not a dubious distinction. It is dubious if the purpose to which it's being applied does not, in fact, carry any weight in the argument. And I think the purpose to which it is being applied in this case, what Fujifilm is attempting to say is that an area in memory, it goes to the question of what a sort of worm of memory is, as it were. In the background section that we just referred to, column one, lines 14 to 17, there's this part that talks about additional writing or read-only portions of the memory. And I think what Fujifilm is attempting to do in making this argument is saying that because a worm memory, something a person of ordinary skill in the art would recognize as a worm storage, can be divided into areas that have been written to and areas that haven't been written to, because the claim says area, one can also take what would be viewed by a person of ordinary skill in the art as a worm memory, parse it down, and come up with a single area that is, in fact, a read-only memory. Let me ask you a little housekeeping question. Please, Karen. In the red brief at note two on page 23, Fujifilm explains the PTAB found that the spec contains a typographical error and that write-only, read many should have read, write once, read many. Do you dispute that? No, I think that's correct. Okay, thank you. That's just for me. I think that's correct. So I guess what I, my understanding of the first point is that the dispute here, and I think maybe the board said this, that for a worm memory, once a section is written, at that point it's read-only, so that your argument depends on saying that in this patent, either it matters who does the first writing, the manufacturer, the user, or that something once a worm is always a worm and not read-only, and that seems like temporal limit on what the thing is, whereas the board said in a seemingly quite straightforward fashion, at a certain point in time, the worm becomes a read-only area. I think this is the key issue, in fact, and where we see error in the board's opinion, I think it's a statement on appendix page seven where they say, even if a user can write to the memory, that's just irrelevant past history. Once they've written to it, it's unalterable. And the reason why we think that's wrong is because it's applying the wrong perspective to the claim construction. It's as if the board is saying, let's look at what a user sees at any particular instant in time, and it's not fair to charge that user with knowledge of the past, what prior users or what the user in the past might have experienced with the memory. But the correct perspective, I think, to apply is what a person of ordinary skill in the art, in view of the intrinsic and extrinsic evidence, would view a read-only area in said memory as being, and that's just looking at the chip and looking at the programming and the conditions that the programming sets up. But isn't it still just looking at the chip? Why doesn't that come to the same place the board does it? Because at one point you look at the chip and it is one thing, and at another point it's another thing, but that second thing actually the claim reads on. So it's not the same thing, Your Honor,  And there's absolutely nothing wrong, I think, with claiming something like this. We often in the computer arts see claims that read on systems that have multiple conditions that may be triggered at different times or under different circumstances that are not all operating at the same time. I think the board implicitly thought there was some sort of problem with that. So when a chip or a computer has those conditions at time two, it may then be infringing even if at time one it didn't. Yes. I think the chip or the computer needs to have the full set of functionality recited in the claim. In this case, what's recited in the claim is a read-only area in said memory. So it comes down to what read-only area in said memory means in the context of the 596 patent. And I think that part of it is relatively clear. Back in the old days when you had hard drives, hard disk drives, the ones that replaced the floppy, they used to have a breakable lock on it that would make it so you couldn't write on it anymore. At that point, does it become read-only? So you're saying that a hard, well, let's say a floppy disk that has a tab on it. Right, with a tab. I don't know, Your Honor. I do know that in the context of the 596 patent, there is something, there's a specific set of characteristics that a read-only area in said memory has to have in order to be read-only. And that's pretty clearly laid out in column 16 and 17. In column 17, the patent says the purpose of this embodiment is to have a predetermined use. And the way that the patent achieves that is by having this use number which tells you the use, putting that in memory, and then putting that memory, making that memory, that part of memory that stores the use number read-only for the express purpose that the user cannot change it. And that's what gives you the predetermined use because read-only memory is preventing the user from changing that. It was also reiterated in the file history at appendix page 501 where the applicant said it's an important feature of the invention that the use number is stored in read-only memory so that the applicant can't change it. Does that prosecution history say at which time it's important that that be identified? Does it have to be identified before it goes to the user? Or is it identified when the user first starts using the device? So if we're looking for, you know, subject verb... I meant in the prosecution history, just to make sure you understood the context of my question. Thank you, Your Honor. So if we're looking for sort of subject verb predicate, it does not say that. But it's one step away by implication, and it's once... Sorry, I didn't... Okay, no, I was just going to ask. Do I remember correctly that BRI would apply here? BRI does apply in this case, Your Honor. So why would it not be reasonable, given that disclosure in column one, describing WIRM and saying that it has read-only areas? That might not be the exact words, but it does use the word read-only in the context of describing what WIRM is. Why isn't that enough, combined with the fact that the plain claim language doesn't have a temporal limitation? Why isn't that enough to at least make this interpretation reasonable? So a few reasons that can all be sort of summarized in the following, which is a person of ordinary skill in the art would not recognize what PLATA is doing as a read-only memory. It's something else, but it's not a read-only memory. And it's not a read-only memory because it's not doing what the specification requires of a read-only memory. What about the fact that the specification itself refers to it as read-only, at least after it's been written onto once? I don't think it does that respectfully, Your Honor. Okay. I think the board refers to two sections of the specification. One is the background, and one is Figure 21. And I think they both indicate that in order to be called WIRM, you need to have a certain collection of functionality. And that collection of functionality is writable and then becomes read-only. And that collection of functionality means WIRM. There's a different collection of functionality that means read-only. And you can see that in the CHIP, in the program. Your view is that the, I guess, the detailed description of the preferred embodiments, its discussion and categorization of WIRM as being something distinct from ROM, it undermines any reliance on Column 1 and the more general disclosure of the prior art? Yes. And, in fact, I would take it a step farther and say that Column 1 actually reinforces that notion. What Column 1 says, if you have these two functionalities, it is WIRM. It doesn't go the step further, which the board indicates that it does. And that is to say, once a WIRM has been written to, we actually call it read-only. What about area? What about the claims use of the term area of the memory as opposed to a read-only memory? Right. So the problem with the area is that the area itself also has this WIRM functionality in PLATA. That is, you can write to it and then it becomes unalterable. So the area itself is like a little WIRM memory in the PLATA reference. And that's why it wouldn't have been recognized as a read-only memory. The one thing the read-only memory has to do in the specification is prevent users from changing the data. And there is an initial value. You're well in your rebuttal time, but keep going. Let me just finish the thought. Sure, go ahead. Whatever you want. The prosecution history and the specification are clear that the one thing that a read-only area in said memory has to do is prevent the user, and by this case they really mean all users because otherwise the security function of the patent is undermined from overriding that use number. And they use a read-only area in said memory to do that. Ergo, the inventors, the one thing they understood was that a read-only area in said memory would in fact prevent the users from changing the value of the use number. Thank you very much. Mr. Williams? May it please the Court? Can I ask you a housekeeping question? Of course. In the red brief at 19, you say the PTAB's institution decision credited Dr. Messner's declaration regarding the construction of read-only memory or a read-only area in said memory. Did the PTAB rely on that declaration in its final written decision to construe that claim term? If they did, I'd like to know where, and if not, can we rely on Dr. Messner's declaration when conducting a substantial evidence review of the PTAB's consideration of extrinsic evidence? So, I mean, as to claim construction, we haven't raised a tough bit to have a deference, and it's not even clear to me under this Court's law how you apply that in the case of BRI because here the PTAB was given discretion to figure out what the broadest reasonable interpretation is. So its construction in the final written decision did, I think, borrow from its institution decision insofar as, you know, this aspect that's being discussed. How do we trace that? Yeah, well, I mean, you can trace it by looking back at the institution decision and seeing what they were assigning to, I suppose. I mean, frankly, I would, even if you treat the issue of claim construction as a matter of law and ignore, you know, what the PTAB did, just treat it as a first instance. I mean, the evidence is before you, obviously, and you can look at it in the same way that the PTAB could de novo, I think. So to the extent you find that Dr. Messner's testimony helpful, I don't see why this Court can't return to it in performing the legal analysis. A few problems with Sony's construction of read-only area of memory. First is even... I can't quite identify what their construction actually is from reading their briefs. It's not entirely clear. The way I read it, though, their construction would still be met by this PLATA reference because what's being described in PLATA is literally the same thing as what the 596 patent talks about with respect to this byte. So in particular, what we have is examples of a cassette. In PLATA, you have a cassette that can be recorded on by the user, or you can get a prerecorded cassette from, like, a movie studio that you get at a rental store where the user can't write to the tape. And that later, in both cases, there is a byte that's either left at 00 when it gets to the user and they can write onto the tape, or the byte is preset at FF in PLATA, and that means that some movie studio has already written onto the tape and now I can't change it. In either case, there was a first writing of the tape, either by the end user or by a movie studio. Once that happens, you can no longer change that byte. It's set forever. That is literally the same thing as what the 596 talks about with respect to this use number in Figure 21. So Figure 21, again, has the same notion of a general tape, use number 0, and it has the notion of a prerecorded tape, and that's use number 1. In the case of the 596 patent, it's not necessarily talking about a movie tape, it's talking about a data tape, but the principle is the same. Once someone has written, in this case, they called it data distribution tape, firmware updating is the example given in Figure 21. Can I interrupt you for a minute? I was confused about your point that Sony's interpretation, somehow, I thought there was a difference because Sony was saying that its interpretation was that the memory could never be rewritten by users, never be written by users, and your position is that it's okay that it's written once, and then after it's written once, it's read only. Isn't that the distinction? Am I missing something? I think the problem comes in that slight change in language between whether it's written or rewritten, because those are two different things. It's got to be written once. Everyone agrees it has to be written once. But the emphasis, I thought, was on by users. I thought that was the distinction, by users. It does, but the problem is that that distinction is actually not present in the 596 patent, to the extent that distinction is present. That's fine, but that's their position. I wanted to make sure I understood, because I do think their position distinguishes the prior being relied upon. So the problem is, in PLATA, you have the same distinction, because you've got an example in PLATA of some upstream entity, the manufacturer of the tape, writing to that area. But that's not a user. So that's not clear, because we don't have a clear definition of user. Do you think the studio is a user? Our argument would be, and this was Dr. Messner's, well, actually, it was their expert, Dr. Bain, who essentially said, anyone who writes to the tape, dated to the tape, is a user. So in that case, it would have been the movie studio that bought the tape from whoever made the tape was the user when they wrote onto the tape. Then they sell it to some second user, me at home, I get the tape. Now, I can't write to that area anymore, in the same way that I can't, you know, it's a read-only area of memory, just like it would be if I bought the tape, written to it myself, and then I can no longer write to it again. Same principle. So you're relying on expert testimony to define user. I mean, my thought, you know, would be that one of the ordinaries here on the yard would usually use the word user to mean the person, you know, the consumer. But, you know, what is the basis for saying that it's not the consumer? Yeah, so, okay, let's, so this is where we get into Dr. Bain's testimony. You know, I don't want to distract you, because I think this is a side. It is. The board's construction is either correct or it's not. It is. That's the issue before us. Yeah, that's true. So, and this raises one of the other problems we have with this construction, which is if you start to import into this claim the notion of who a user is, what they're doing, how do we, you know, and then you have to start testing for things like, is the user actually putting data onto this tape or not, you create an indefinite problem. It creates mischief, because now we have to define what a user is. And this is actually a severe problem, because, for instance, if you look at appendix page 1141, where we were cross-examining Sony's expert about his user, we asked him this question. This is at transcript page 29, starting with line 10. This is, again, 1141. Question. Okay, so if I go by a blank tape cartridge with a memory and I take it home, am I a user? Answer. I'm sorry. What's MIC? MIC is memory in cartridge. So this is the memory that's in the cassette. Or memory in cassette is also. Answer. A user doesn't attach to a person. It attaches to a set of activities and a role. So you will first format the tape, and according to my construction, during that set of activities, you wouldn't be a user. And then you would finish formatting the tape, and you would begin transferring your backup to it, for example, and you, when you commence that activity, you would be moving user data to the tape, and so as a consequence, you would be a user. So, and there's some other, I mean, we have sites and briefs and some other examples of the problem here, which is that, how do you know then who is the user? The movie studio could very well be the user in that example the first time they write to the tape. So. So all you've got is Schrodinger's tape. Yeah, exactly, which we have other questions about that. How do I know when I'm a user? There's clear, you would have very hard time figuring out who is infringing in that situation, if anybody. The other thing I want to just make sure that I pointed out is the specification itself doesn't have this clear distinction that Sony seems to be finding between ROM and WORM, and so we point to this example in figure 20 of the patent. So actually figure 20 is broken into three parts, 20A, 20B, and 20C, and these are three different embodiments of how you would essentially store this data in the memory in a way that would not be rewritable or writable. And one of the examples they give in the specification is figure 20C, which starts, the description of that begins at column 16, line 65, and then it goes over to column 17. And there they show this example where you can use the entire storage area as a RWM, which is a rewritable memory region, and you provide this write control means, that box shown in figure 20 to the left, and what it says then over on column 17 then is, when you get down to around line 9, therefore writing to the region treated as the ROM region can be performed. So the specification itself teaches you that this claimed area that is a read-only area of memory can actually be written to. Even after you make this statement. So this construction that Sony is proposing simply can't be right, I mean the patent itself teaches you that there are situations where you can write to that area of memory, just like in PLAT, that there are situations where you can write to the area of memory, and in PLAT, once it's written to, it can't be changed. This argument, by the way, was, this discussion in the patent was cited in the final written decision at page 822. I think Sony argued in its reply brief that the board never addressed this section of the specification, but it was certainly argued below, it was argued extensively at the hearing, and they did cite that, at least figure 20A at page 822. Then the other example I wanted to point to is the example that we talk about again in the brief, which I already mentioned basically, this notion in figure 21 that you've got the data distribution tape. So this is a tape that, if you had already written the use number 1 into the memory of this tape, you would never be able to write into the memory of the tape, you would never be able to actually write any data on the tape, which would make it unusable. So clearly there has to be a way for when you're writing your data distribution data onto the tape, you could do that and then subsequently write the use number 1 to the memory of the tape to make clear to downstream entities that that tape couldn't be rewritten. So again, fully consistent with what the board looked at all this, and concluded I think very clearly that what this claim means, read-only area of memory, just means that at some point this memory becomes unwritable by whoever has the tape. And they found, and that's a perfectly reasonable, I mean it's probably frankly the right construction under any standard, certainly under the broadest reasonable interpretation standard, it seems wholly consistent with what the specification is describing, and it's exactly what Platt had. Unless there's, I mean there was another issue in the brief which wasn't raised, so I don't intend to address it unless the board has any questions. Can I just ask a question about that? Yes. Can you explain how in the absence of a one-to-one correspondence between serial numbers and cassettes would the function of this patent once the identification information to perform be performed? How would the function be? Well first of all, I mean again there's a distinction between whether it has to uniquely identify a cassette. That's what I meant by one-to-one correspondence, right? No two cassettes with the same number. Yeah, so unique is not in the claims. It was never proposed as a construction below, and it would obviously be very different from an infringement perspective if the memory had to be big enough to have a unique number for every possible cassette ever made in the universe. So what's left instead is the notion that you have a number there that's used to identify the tape, and that's exactly what Platt has. Platt has a serial number that's used to identify the cassette. I mean the board made a very clear finding about that in its final written decision, and they said at A25, Platt teaches that the serial number identifies the cassette. I mean they read Platt, they looked at the evidence, and they reached that conclusion. But the board said, and we think that's true even if a bunch of cassettes have the same serial number. And I guess I took at least part of Sony's argument to be that can't possibly be what identification information in our patent is about because the whole point there is to prevent the user, whoever that may be, from finding another cassette, taking the memory out of it. That memory doesn't have a usage control, a writing bar, and putting it into the cassette that did have one. And you can do that if you find another cassette with the same serial number. I think I've understood. Yeah, I think their argument is what the potential workaround would be for an attacker. That's exactly the same principle that Platt was concerned about, which is why they have a serial number in the cassette that needs to match the serial number on the tape. So the two cases are identical. They're both doing the exact same thing. The only question is how big does the serial number need to be in order to essentially make that probability low enough. Probability so low that no one would bother performing such an attack. Did Sony make a probability argument or just a unique? That is, it has to be unique. It doesn't have to be. Did they make an argument that said, what is it, 25,000 plus? There was some argument about the size. Yeah, there was some argument about the size of that serial number. They do say that given the size of the field that was described in the 596 patent would be big enough to uniquely identify every cassette. I think they say that in a footnote. I don't have it in front of me, unfortunately. Below there was some, I mean, essentially the point is that if you're trying to defeat this kind of attack that you're referring to, you would need to make the attack hard enough. Right, but I would think you would not actually need a one-to-one correspondence. All you need to have is a large enough number that the probability of a miscreant finding another tape with the same serial number and a different memory control. That's true. Which presumably all the copies of the Karate Kid have the same one. Correct, yeah, which is what Platt was really getting at in this discussion of the rental market. But all of what you've said is true, and the problem is we didn't get into a lot of those questions below because Sony conceded the construction was correct. Under the construction, nothing requires uniqueness, so we never had to really get in there, develop that evidence from the experts below. Unless there's any further questions, I'll sit down. Thank you, Your Honor. Just a few quick points. First of all, on the question of the identification of the user and definiteness, I think this is being made far too complex. A person of ordinary skill in the art knows the difference between a manufacturer and a user. The example Fujifilm gives in its brief of two people sitting at a table, the cassette's in one person's hand and it's infringing. His studio example is a third party. It's not the tape manufacturer. That's correct, Your Honor. It's not the viewer. It's the first loader, and it might be a company. It might be me from my kid's wedding or something, and I certainly don't want the recipients of my tape to be able to erase it. So it's not just the world. The world doesn't divide neatly into tape manufacturer and consumer. So it certainly divides into manufacturer and non-manufacturer quite neatly, I think. And in the instance of the videotape rental store where perhaps you have a videotape supplier that's putting the program on the tape, that is, in fact, a user, and if that user has the ability to change the read-only memory, then it doesn't meet Sunny's construction because the read-only memory needs to prevent all users from accessing the use number in the memory. And so that example I don't think is particularly instructive toward the end goal of defining what a read-only area in said memory. And it really is. It really goes back to how we have to view in terms of claim construction whether or not a device falls within the concept of read-only area in said memory or not, and that's from the perspective, again, of a person of ordinary skill who's going to look at the chip, who's going to look at the programming, the functionality on the chip. And the one thing that has to do is exclude users from changing that information. And that does, in fact, I think also, just to get back to a question the judge still asked during the opening part of this presentation, it does actually exclude users from writing the first instance of the byte, quote-unquote, because that memory always has a value in it when it comes from the manufacturer. Writing to the memory is overwriting the memory. What's your response to the reliance on column 17, lines 9 through 12? Oh, this is the figure 20C embodiment I think that Mr. Williamson was talking about. The figure 20C embodiment is the password write protect. What that argument assumes is that the user has the password and the ability to write to it. Not that, for example, a manufacturer keeps the password in order to do maintenance on the chip or something like that. Within the context of everything the patent says in column 16 and column 17, in other words, the point of the invention is to lock in a predetermined use and to prevent users from changing that information, it would be, I think, appropriate to assume that only the manufacturer has access to that password. But there is a question of who has access to the password. This is not a simple statement that the 596 patent is saying that someone downstream can write to that memory. It's saying that a person can write to it if they have the password. And then we have to figure out who has the password. And in the context of the 596 patent, that can really only be the manufacturer because the manufacturer is the one who sets the predetermined use. I'm Jeff Council. I'm going to wrap it up. Thank you very much, Your Honor. I think just simply saying that if we construe these terms according to the correct perspective of the Personal Board of New Scalability and the intrinsic evidence, one arrives at the constructions that Sony has, which would exclude the implied reference. Thank you very much. Thank you, counsel.